**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | |
|---|---|
| **DANNY L. CARTER III,**<br>    Plaintiff<br><br>v.<br><br>**ANDREW M. SAUL,**<br>**Commissioner of Social Security,**<br>    Defendant | Civil Action No. 2:19cv00032<br><br>**REPORT AND RECOMMENDATION**<br><br>By: Pamela Meade Sargent<br>United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Danny L. Carter, III, ("Carter"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Carter protectively filed an application for SSI[1] on December 18, 2015, alleging disability as of July 1, 2005, based on attention deficit hyperactivity disorder, ("ADHD"); bipolar II disorder; personality disorder, not otherwise specified; difficulty focusing and concentrating; and hepatitis C. (Record, ("R."), at 12, 212-19, 231.) The claim was denied initially and upon reconsideration. (R. at 99-101, 103-05, 108-09, 111-13.) Carter then requested a hearing before an administrative law judge, ("ALJ"). (R. at 114-15.) A hearing was held on February 13, 2018, at which Carter was represented by counsel. (R. at 36-71.)

By decision dated May 31, 2018, the ALJ denied Carter's claim.[2] (R. at 12-31.) The ALJ found that Carter had engaged in substantial gainful activity from

---

[1] The record shows that Carter protectively filed his initial application for SSI on October 6, 2009, alleging disability as of July 1, 2005, based on ADHD; bipolar disorder; personality disorder; and anxiety. (R. at 73, 83.) The Disability Determination Explanation indicated that Carter had marked limitations in concentration; working with others; working without interruptions; accepting criticism from supervisors; and getting along with people. (R. at 83.) A decision was rendered on December 17, 2009. (R. at 73, 83.) At the February 2018 hearing, Carter's attorney stated that Carter had previously been awarded disability in 2010, and, shortly thereafter, he was incarcerated. (R. at 39, 43.) Carter testified at his hearing that he was awarded disability based on ADHD, bipolar disorder and anxiety; however, shortly thereafter, he was incarcerated and did not receive benefits prior to being incarcerated. (R. at 39, 54.)

[2] At his hearing, Carter sought a period of closed disability from December 13, 2015, until October 1, 2017. (R. at 41.) Carter began searching for employment and started working as an electrician's helper on November 30, 2017. (R. at 12, 41.) The ALJ denied Carter's motion for a closed period from December 18, 2015, through September 30, 2017, the day before the month Carter started looking for work. (R. at 12.) Thus, the relevant time period for determining disability is from December 13, 2015, the application date, through September 30, 2017, the day before the month that Carter sought employment.

- 2 -

November 30, 2017, through the date of the decision. (R. at 14.) The ALJ found that there had been a continuous 12-month period during which Carter did not engage in substantial gainful activity. (R. at 15.) The ALJ determined that Carter had severe impairments, namely bipolar disorder; generalized anxiety disorder; ADHD; social anxiety; and personality disorder, but he found that Carter did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-16.) The ALJ found that Carter had the residual functional capacity to perform low-stress work[3] at all exertional levels that did not require more than occasional interaction with co-workers and the public. (R. at 19.) The ALJ found that Carter was able to perform his past relevant work as a material handler. (R. at 29.) In addition, based on Carter's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Carter could perform, including the jobs of a bottling line attendant and a custodian. (R. at 29-30.) Thus, the ALJ concluded that Carter was not under a disability since December 18, 2015, the application date, as defined by the Act and was not eligible for SSI benefits. (R. at 30-31.) *See* 20 C.F.R. § 416.920(f), (g) (2019).

After the ALJ issued his decision, Carter pursued his administrative appeals, (R. at 209, 293-95), but the Appeals Council denied his request for a review. (R. at 1-5.) Carter then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481

---

[3] The ALJ defined low-stress work as work that did not require more than occasional decision making or more than occasional changes in the work setting. (R. at 19.)

(2019). This case is before this court on Carter's motion for summary judgment filed February 10, 2020, and the Commissioner's motion for summary judgment filed March 11, 2020.

## II. Facts[4]

Carter was born in 1983, (R. at 42, 212), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c). Carter has some college education, and, at the time of his hearing, he was performing industrial electrical work. (R. at 41-42, 232.) Carter stated that he was incarcerated for two years beginning in 2006 on a breaking and entering conviction and again from January 2010 through December 2015 for a probation violation on a driving under the influence, ("DUI"), conviction. (R. at 20, 43-44.) Carter stated that he attempted suicide on two occasions by overdosing. (R. at 52.) He stated that while incarcerated, he was placed in segregation because he could not deal with large groups of people. (R. at 55-56.) Carter stated that he would "end up snapping," which resulted in altercations. (R. at 56.) He stated that he experienced a lot of anxiety over being released from prison due to worrying about how he was going to survive after being released. (R. at 56.)

Barry Hensley, a vocational expert, also testified at Carter's hearing. (R. at 64-70.) Hensley was asked to consider a hypothetical individual of Carter's age, education and work history, who could perform work at all exertional levels, but who would be limited to a low-stress job, meaning only occasional decision making

---

[4] Carter's only dispute is with respect to the ALJ's assessment of his mental limitations. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) Therefore, the court will limit its discussion to those facts relevant to Carter's mental impairments and accompanying limitations.

and changes in the work setting, and who could have only occasional interaction with the public and co-workers. (R. at 66-67.) He stated that such an individual could perform Carter's past work as a material handler. (R. at 67.) Hensley also stated that there were other jobs that existed in substantial numbers that such an individual could perform, including jobs as a bottling line attendant, at the light[5] exertional level, and a custodian, at the medium[6] exertional level. (R. at 67.) Next, Hensley was asked to consider the same hypothetical individual, but who would be off task 20 percent of the workday; who would be absent from work two days a month; and who could not engage in any production rate or pace work. (R. at 67-68.) He stated that there would be no jobs available that such an individual could perform. (R. at 68.) Hensley stated that there would be no jobs available should the individual be limited as found in psychologist Stair's assessment. (R. at 68-70, 634-35.)

In rendering his decision, the ALJ reviewed records from Julie Jennings, Ph.D., a state agency psychologist; Eugenie Hamilton, Ph.D., a state agency psychologist; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Red Onion State Prison; Dr. William M. Handy, M.D.; University of Virginia Health System, ("UVA"); Arthur W. Stair, III, M.A., a licensed senior psychological examiner; The Health Wagon; Stone Mountain Health Services; Johnston Memorial Hospital; and Frontier Health.

---

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2019).

[6] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 416.967(c) (2019).

Carter's mental health history involves treatment with B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, since 2002 for ADHD. (R. at 316, 612.) In 2002 and 2004, Carter was treated at Frontier Health for major depressive affective disorder, single episode, and social phobia. (R. at 568-82, 594-601, 603-09.) In July 2005[7] Carter was hospitalized at Johnston Memorial Hospital and Southwest Virginia Mental Health Institute for an attempted suicide by drug overdose. (R. at 299, 526-57.) Carter was diagnosed with anxiety disorder, not otherwise specified; adjustment disorder with depressed mood; and dependent personality traits. (R. at 299.) In September 2005, Lanthorn diagnosed major depressive disorder, recurrent, severe; generalized anxiety disorder; possible psychotic processes; alcohol abuse and sedative/hypnotic or anxiolytic abuse; and personality disorder, not otherwise specified. (R. at 299, 306-13, 622-29.) Lanthorn noted that Carter was always depressed and self-critical; he suffered from chronic insomnia; he often had confused thinking and impaired judgment; and he had difficulty controlling his moods overall. (R. at 314.) In April 2006, Dr. J. Sidney Alexander, M.D., a psychiatrist, found that Carter was intoxicated with alcohol and Ambien and suffered from an Ambien-induced delirium at the time of his offense. (R. at 299.)  Dr. Alexander also noted that Carter possibly suffered from bipolar II disorder. (R. at 299.) Prior testing revealed that a Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), was administered, and Carter obtained a performance IQ score of 85, a verbal IQ score of 89 and a full-scale IQ score of 87. (R. at 299.)

On September 24, 2009, Lanthorn evaluated Carter's functioning after being charged with DUI in January 2009. (R. at 298-305.) Carter reported that he was not receiving psychiatric or psychotherapeutic intervention and was taking no

---

[7] In 2005, Carter was treated for depression and anxiety at Stone Mountain Health Services. (R. at 520-24.)

psychotropic medication. (R. at 301.) He stated that during the final phases of his incarceration, he discontinued all psychotropic medications to function better. (R. at 301.) Carter stated that he felt significantly better stating, "I feel the best I have ever felt my entire life." (R. at 301.) Lanthorn noted that during 2009, Carter had received three speeding tickets. (R. at 301.) Carter reported that his mind frequently wandered, and he could not concentrate on his driving. (R. at 301.) Lanthorn reported that Carter had significant difficulties focusing his concentration and was restless and fidgety in his chair. (R. at 301.) Carter's mother reported that Carter had difficulty completing tasks, following a list of activities and tasks that were laid out for him and was very forgetful. (R. at 301-02.) Lanthorn diagnosed ADHD and bipolar II disorder, recurrent major episodes with hyper-manic episodes. (R. at 304.) He reported that Carter had difficulty with concentration and performing sedentary tasks; he was disorganized and forgetful; he often depended on others to maintain orders; he had difficulty keeping track of several things at once; he had trouble finishing tasks; he often changed plans or jobs in midstream; and he was restless and impulsive. (R. at 304.)

On March 8, 2010, Carter was seen at Frontier Health for alcohol dependence, bipolar II disorder and adult antisocial behavior. (R. at 562-67, 583-88.) His then-current Global Assessment of Functioning, ("GAF"),[8] score was assessed at 50, with his highest and lowest GAF scores being 50[9] within the past six months. (R. at 583.)

---

[8] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[9] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." See DSM-IV at 32.

On March 11, 2015, records from the Virginia Department of Corrections, ("VDOC"), indicate that Carter reported that he felt "much better" when prescribed medications and indicated that his anxiety continued to worsen without medication management. (R. at 402.) On March 25, 2015, Carter stated that, "alcohol is my problem." (R. at 425.) He also reported anxiety and ADHD. (R. at 425.) On April 23, 2015, Carter complained of increased anxiety as his release date was approaching. (R. at 416.) Carter's affect was anxious; his thought processes were linear; and he had good judgment and impulse control. (R. at 416.) He was diagnosed with generalized anxiety disorder and a history of alcoholism. (R. at 416.) On May 27, 2015, a medical discharge summary from the VDOC indicated that Carter was diagnosed with anxiety and was prescribed Lexapro and Atarax. (R. at 370.) On June 20, 2015, Carter was involved in an altercation. (R. at 371.) On July 16, 2015, Carter reported that he was tolerating his medication, which helped his anxiety. (R. at 415.) Carter's mood was good; his affect was full; his thought processes were linear; and he had good judgment, impulse control and insight. (R. at 415.) He was diagnosed with generalized anxiety disorder, stable. (R. at 415.) On October 8, 2015, Carter reported that he could not take Lexapro and requested "intoxicating med[ication] for immediate anxiety relief." (R. at 414.) Carter's affect was full; his thought processes were linear; he had good judgment and impulse control; and his insight was fair. (R. at 414.) He was diagnosed with generalized anxiety disorder and possible past substance dependence. (R. at 414.) Carter was prescribed Atarax. (R. at 414.)

On December 7, 2015, Carter reestablished care with Dr. William M. Handy, M.D.[10] (R. at 433-36.) Carter complained of anxiety, but he denied depression. (R. at 433.) Dr. Handy diagnosed anxiety and bipolar II disorder, stable. (R. at 434.)

---

[10] In 2009 and 2010, Dr. Handy treated Carter for bipolar II disorder, ADHD and alcohol and substance abuse. (R. at 437, 460-62, 464-65, 560.)

- 8 -

On March 11, 2016, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Carter was mildly restricted in his activities of daily living; experienced mild difficulties maintaining social functioning and in maintaining concentration, persistence or pace; and had experienced no repeated episodes of extended-duration decompensation. (R. at 77-78.)

On April 21, 2016, Arthur W. Stair, III, M.A., a licensed senior psychological examiner, evaluated Carter. (R. at 486-92.) Carter reported that he refused to take psychiatric medication due to paranoia and fear that the side effects could harm him badly. (R. at 487.) Stair reported that Carter struggled on the serial 7's task, as he became distracted two or three times due to anxiety and attention problems; his short-term memory was marginally intact; his thinking pattern appeared to be fairly well organized, though mild memory problems and attention limitations were apparent; his affect was dysphoric; his attention span was fair; his speech was normal; his eye contact was fair; he seemed to be uncomfortable talking throughout the interview; he became frustrated if he was asked two to three things without letting him answer; and he talked over Stair when he had either heard enough or when he needed to answer part of what was asked before getting sidetracked. (R. at 489.) Stair diagnosed bipolar II disorder, recurrent depressive episodes with hypomania; generalized anxiety disorder, moderate; ADHD; and personality disorder, unspecified. (R. at 491-92.)

Stair opined that Carter had a moderately impaired ability to understand simple information or directions with the capacity to carry them out in a vocational setting and to comprehend and implement multistep complex instructions. (R. at 491.) He opined that Carter had a markedly limited ability to maintain persistence

and concentration on tasks for a full workday and workweek; to adapt to changes in the workplace; and to maintain social relationships. (R. at 491.)

On August 1, 2016, Eugenie Hamilton, Ph.D., a state agency psychologist, completed a PRTF, finding that Carter was mildly restricted in his activities of daily living; experienced moderate difficulties maintaining social functioning and in maintaining concentration, persistence or pace; and had experienced no repeated episodes of extended-duration decompensation. (R. at 89-90.)

That same day, Hamilton completed a mental assessment, finding that Carter was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting. (R. at 92-94.) Hamilton stated that Carter's work-related mental abilities were, otherwise, not significantly limited. (R. at 92-94.)

On December 19, 2016, Teresa Gardner, F.N.P., a family nurse practitioner with The Health Wagon, saw Carter for his complaints of anxiety. (R. at 505-06.) Carter reported that he feared being in crowded places. (R. at 505.) Gardner diagnosed chronic agoraphobia with panic disorder, stable; anxiety disorder; and chronic social phobia, generalized, stable. (R. at 505-06.)

On December 15, 2017, Lanthorn opined that Carter met or equaled the criteria of § 12.04, the listing for mood disorders, and § 12.06, the listing for anxiety

disorders, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04 and 12.06. (R. at 611, 638.)

On January 20, 2018, Stair opined that Carter met or equaled the criteria of § 12.04, the listing for mood disorders, and § 12.06, the listing for anxiety disorders, and that the earliest date that he met these listings was approximately 2005.[11] (R. at 633, 637.) That same day, Stair completed a mental assessment, finding that Carter had a satisfactory ability to understand, remember and carry out simple and detailed job instructions and to maintain personal appearance. (R. at 634-36.) He found that Carter had a seriously limited ability to follow work rules; to use judgment in public; to function independently; to maintain attention and concentration; and to understand, remember and carry out complex job instructions. (R. at 634-35.) Stair opined that Carter had no useful ability to relate to co-workers; to deal with the public; to interact with supervisors; to deal with work stresses; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 634-35.) He opined that Carter could not manage his own benefits and that he would be absent from work more than two days a month. (R. at 636.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2019). *See also Heckler v. Campbell,* 461 U.S. 458, 460-62 (1983); *Hall v. Harris,* 658 F. 2d 260, 264-65 (4th Cir. 1981). This process requires

---

[11] Carter's attorney admitted at the hearing that he had sent Lanthorn and Stair the incorrect assessment forms, which represented a child listing rather than an adult listing. (R. at 39-40.)

- 11 -

the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(A)-(B); *McLain v, Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano,* 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439-40 (4th Cir. 1997).

Carter argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Brief at 4-5.) Specifically, Carter argues that the ALJ erred by failing to give controlling weight to the opinions of psychologists Lanthorn and Stair, and by giving controlling weight to the opinions of the state agency psychologists. (Plaintiff's Brief at 5.) Carter contends that the state agency consultants' assessments were "stale [and] outdated." (Plaintiff's Brief at 5.)

The ALJ found that Carter had the residual functional capacity to perform low-stress work at all exertional levels that did not require more than occasional interaction with co-workers and the public. (R. at 19.) The ALJ defined low-stress work as work that did not require more than occasional decision making or more than occasional changes in the work setting. (R. at 19.) As noted above, the relevant time period for determining disability in this case is from December 13, 2015, the application date, through September 30, 2017, the day before the month that Carter sought employment. Based on my review of the record, I do not find that substantial evidence exists in the record to support the ALJ's residual functional capacity finding during this time frame.

In making his residual functional capacity assessment, the ALJ stated that he was giving "little weight" to the assessments of Lanthorn and Stair. (R. at 23-27.) The ALJ stated that he was giving Lanthorn's 2009 assessment "little weight" because it was created six years before Carter's protective filing date. (R. at 23.) He also stated that the psychiatric evidence of record indicated that Carter's mental health issues had improved. (R. at 23.) The ALJ gave Stair's 2016 and 2018 assessments "little weight" because they were more restrictive than warranted by the psychiatric evidence of record. (R. at 24-27.) Likewise, "little weight" was given to Lanthorn's 2017 assessment because it was more restrictive than warranted by the

psychiatric evidence of record. (R. at 25.) Instead, the ALJ gave "great weight" to state agency psychologist Hamilton's August 2016 assessment because it was consistent with the psychiatric evidence of record. (R. at 22-23.) In addition to finding that Carter experienced moderate difficulties maintaining social functioning and in maintaining concentration, persistence or pace, Hamilton found that Carter was moderately limited in his ability to understand, remember and carry out detailed instructions and to accept instructions and respond appropriately to criticism from supervisors. (R. at 92-94.) However, the ALJ did not acknowledge these limitations.

It is well-settled that, in determining whether substantial evidence supports the ALJ's decision, the court must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

In addition, the ALJ noted that Carter was awarded benefits for his mental health issues on a prior application in 2009. (R. at 27.) The ALJ stated that, Carter's benefits stopped when he was incarcerated in 2010. (R. at 27.) In 2009, Lanthorn

reported that Carter had significant difficulties focusing his concentration and was restless and fidgety in his chair. (R. at 301.) Carter's mother reported that Carter had difficulty completing tasks, following a list of activities and tasks and was very forgetful. (R. at 301-02.) Lanthorn reported that Carter had difficulty with concentration and performing sedentary tasks; he was disorganized and forgetful; he often depended on others to maintain orders; he had difficulty keeping track of several things at once; he had trouble finishing tasks; he often changed plans or jobs in midstream; and he was restless and impulsive. (R. at 304.)

In 2016, Stair reported that Carter struggled on the serial 7's tasks because he became distracted due to anxiety and attention problems. (R. at 489.) Stair opined that Carter was moderately limited in his ability to understand simple information or directions with the capacity to carry them out and to comprehend and implement multistep complex instructions. (R. at 491.) He also found that Carter had marked limitations in his ability to maintain persistence and concentration on tasks for a full workday and workweek; to adapt to changes in the workplace; and to socially interact. (R. at 491.)

Furthermore, in January 2018, Stair found that Carter had a seriously limited ability to follow work rules; to use judgment in public; to function independently; to maintain attention and concentration; and to understand, remember and carry out complex job instructions. (R. at 634-35.) He also found that Carter had no useful ability to deal with work stresses; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 634-35.) These limitations are consistent with Carter's testimony that, while incarcerated, he was placed in segregation because he would "end up snapping," which resulted in altercations. (R. at 55-56.) In April 2014, Carter was seen for a segregation review

and it was noted that he was agitated and angry for not being able to get a pen. (R. at 411.) In June 2015, VDOC records note that Carter was involved in an altercation. (R. at 371.)

While the ALJ mentioned that Carter had been awarded disability benefits in 2009, it is unclear from the record if Carter was awarded benefits at the initial stage or if an ALJ rendered a decision. Thus, I cannot determine if the ALJ failed to evaluate Carter's prior disability benefits award in accordance with *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 477 (4th Cir. 1999).

In accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4),

> "[w]hen adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim."

AR 00-1(4), WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013).

While a step-by-step explanation is not required for an ALJ to comply with AR 00-1(4), an ALJ's written decision must provide an explanation for discrediting or failing to adopt past administrative findings favorable to the claimant. *See Grant v. Colvin*, 2014 WL 852080, at *7 (E.D. Va. Mar. 4, 2014). The ALJ has a duty to resolve conflicts within the record and provide the claimant with a justification for the resolution. *See Kasey v. Sullivan*, 3 F.3d 75, 79 (4th Cir. 1993). Based on my review of the record, I cannot find that substantial evidence exists to support the ALJ's mental residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist in the record to support the ALJ's finding regarding Carter's mental residual functional capacity;

2. Substantial evidence does not exist in the record to support the ALJ's weighing of the medical evidence; and

3. Substantial evidence does not exist in the record to support the Commissioner's finding that Carter was not disabled under the Act and was not entitled to SSI benefits from December 18, 2015, through September 30, 2017.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Carter's motion for summary judgment, deny the Commissioner's motion for summary judgment and remand Carter's claim to the Commissioner for further development.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:   October 8, 2020.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE